**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

RICHARD CAIRES,
      Plaintiff,                       **CIVIL ACTION NO**
                                        **3:09-cv-02142 (VLB)**

**v.**

                                        **September 30, 2010**

JP MORGAN CHASE BANK,
      Defendant.

## MEMORANDUM OF DECISION AND ORDER GRANTING THE DEFENDANT'S [DOC. #12] 12(b)(1) MOTION TO DISMISS THE PLAINTIFF'S COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6)

        The Defendant, JP Morgan Chase Bank (hereinafter referred to as "Chase" and as "JPM"), moves to dismiss the Complaint filed by the Plaintiff, Richard Caires ("Caires") pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) [Doc. #12]. In this proceeding, relating to a note and mortgage issued by Caires to Washington Mutual Bank, F.A., ("WAMU"), evincing and securing, respectively, a loan made by WAMU to Caires. Caires asserts three causes of action against Chase, as WAMU's successor in interest: 1) fraud in the inducement; 2) equitable estoppel from foreclosure upon the mortgaged property; and 3) violation of the Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. § 42-110a et seq. during the formation of the mortgage at issue. [Doc. #1]. Chase contends that the Court lacks subject matter jurisdiction over this matter by virtue of the Financial Institutions Reform, Recovery & Enforcement Act of 1989, 12 U.S.C. § 1821(d), (FIRREA), and that Caires fails to state a cause of action for which the Court can grant relief due to

the application of the <u>D'Oench, Duhme</u> doctrine as codified in 12 U.S.C. § 1823(e).  [<u>Id.</u>]  Pursuant to the following analysis, Chase's motion to dismiss [Doc. #12] is GRANTED.  This dismissal is without prejudice to the Plaintiff's right to file an amended complaint not inconsistent with this order not later than October 14, 2010.

I. <u>Factual and Procedural Background</u>

The following facts are based on the Plaintiff's Complaint [Doc. #1] and are accepted as true for purposes of this motion unless otherwise noted:  In December 2006, Caires, a citizen and resident of Greenwich, CT, entered into a mortgage contract with WAMU to purchase 634 North Street, Greenwich, CT.  In January 2007, Caires considered potential lenders for a six million dollar renovation of the property.  Relying upon representations made by WAMU employees regarding fees and his ability to convert to a lower interest rate, Caires agreed to sign to a two-phase loan with WAMU consisting of construction and conventional post construction phases.  WAMU lenders indicated that the loan would have a reserve account, apparently funded with loan proceeds, during the construction phase to pay for loan servicing.  The lenders also indicated that the interest rate during the first 18 month period of construction or to the date of Caires' Certificate of Occupancy would be 8.50%, and that following receipt of the Certificate of Occupancy the construction loan would be converted to a 5 year Adjustable Rate Mortgage (ARM) bearing interest at the 2 year

Treasury rate plus 2 percent.  Caires claims that the lenders indicated that his loan would not require any out of pocket money, but that WAMU failed to abide by its representations and charged Caires $98,000 to close the loan, and "slipped some clause in that the 8.5% construction phase rate would stay in place for 5 years and would not adjust as promised on the date of the Certificate of Occupancy."

On September 25, 2008, the United States Office of Thrift Supervision seized WAMU and placed it into receivership with the FDIC.  On the same day, the FDIC sold WAMU and its subsidiaries to Chase through a Purchase and Assumption Agreement.

During the construction period of Caires' loan, Caires was regularly assured by WAMU, and subsequently by Chase, that his loan would be converted or that he would be able to refinance his loan "with no problem or money out of pocket" when the Certificate of Occupancy was received. In particular, Caires alleges that WAMU and then Chase representatives indicated that "after the 18 month construction period Caires would pay interest instead of the reserve account paying it.  If the certificate of occupancy was not issued by the 18 month term Caires could extend the construction phase time period by paying a penalty fee . . .Caires was told that if he required more time it was not a problem and the reserve account, if it still had money in it would continue to pay the loan servicing."

After Caires paid a penalty fee of a ¼ point of the loan amount to extend the mortgage's construction period, "WAMU/JPM charged Caires

the interest service on the loan although the reserve account had plenty of money in it" and "then reduced the size of Caires' loan by the amount left in the reserve account without adequate warning and outside of the agreed upon terms leaving Caires to pay the servicing out of pocket depleting Caires' reserves."

Caires also claims that he was coerced by "WAMU/JPM" on May 2, 2009, to accept a modification and reduction of the loan amount effective on March 1, 2009; and that on July 2, 2009, Chase failed to fully honor an application made by Caires to draw down on the loan to fund construction costs, claiming that the Plaintiff's property had depreciated in value and reduced the amount Caires could draw from $160,700 to $62,000, which "put Caires in an untenable position and coerced him to accept these unbargained for terms." The Complaint also notes dissatisfaction with servicing of his account during the transition of the management of his account from WAMU to Chase, and alleges that during 2009 an assistant manager made further assurances that Caires' interest rate would decline significantly upon issuance of the Certificate of Occupancy. The Plaintiff did not attach the loan documents to, or describe all of the relevant loan terms in, his complaint.

On November 24, 2009, the Plaintiff filed a summons and complaint in the Connecticut Superior Court. On December 30, 2009 Chase removed this action on the basis of diversity of citizenship, pursuant to 28 U.S.C. §

4

1332(a)(1), and federal question jurisdiction, pursuant to 28 U.S.C. §1331. [Doc #1]. Chase now moves to dismiss the Complaint, in its entirety.

## II. Standard of Law

"A federal court has subject matter jurisdiction over a cause of action only when it 'has authority to adjudicate the cause' pressed in the complaint." Arar v. Ashcroft, 532 F.3d 157, 168 (2d Cir. 2008) vacated on other grounds, 585 F.3d 559 (2d Cir. 2009), cert. denied, 130 S. Ct. 3409 (2010) (quoting Sinochem Int'l Co. v. Malay Shipping Corp., 549 U.S. 422, 425 (2007). "Determining the existence of subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Id. (internal citations and quotation marks omitted). "When jurisdiction is challenged, the plaintiff bears the burden of showing by a preponderance of the evidence that subject matter jurisdiction exists, and the district court may examine evidence outside of the pleadings to make this determination." Id. (internal citations and quotation marks omitted). "[T]he court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." Morrison v. Nat'l Austl. Bank Ltd., 547 F.3d 167, 170

(2d Cir. 2008) (internal citations and quotation marks omitted) (alteration in original).

The United States Supreme Court recently reexamined the standard governing a motion to dismiss, made pursuant to Rule 12(b)(6), for failure to state a claim upon which relief may be granted.  <u>See</u> <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937 (2009).  "Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'"  <u>Id</u>. at 1949.  While Rule 8 does not require detailed factual allegations,

> [a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.  Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement."  To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.

<u>Id</u>. (internal citations omitted).

In evaluating a motion to dismiss, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint.  <u>Hayden v. Paterson</u>, 594 F.3d 150, 161 (2d Cir. 2010).  "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'"  <u>Id</u>.  (quoting <u>Iqbal</u>, 129 S.Ct. at 1950).  "At the second step, a court should determine whether the [remaining] 'well-pleaded factual allegations,' assumed to be true,

'plausibly give rise to an entitlement to relief.'" Id. (quoting Iqbal, 129 S.Ct. at 1950).

### III. Analysis

### A) The Defendant's Motion to Dismiss Pursuant to Rule 12(b)(1)

The Defendant argues that pursuant to the FIRREA, the Court lacks jurisdiction over the Plaintiff's claims against Chase, because Chase is an assignee of the FDIC, and therefore benefits from the FDIC's claim exhaustion requirements that are specified in 12 U.S.C. §§ 1821(d)(3) - (d)(9). [Doc. #13]. In response, the Plaintiff argues that the legislature intended for the claim procedure and statutory protections enumerated in §1821(d) to apply exclusively to the FDIC, and that the "rights, powers and immunities" of FIRREA only apply to claims made against the FDIC and not to its assignees. [Doc. #16]. The Plaintiff claims that Chase knowingly purchased the assets and their liabilities at a reduced price and that the FIRREA's application ended when Chase purchased the loan in question from the FDIC:

> Defendant argues that all claims arising out of any asset of WAMU, or any other failed bank, purchased by J.P. Morgan Chase from the FDIC is subject to the claims process set out in 12 U.S.C. §§ 1821(d)(3)-(9) . . . This argument is patently incorrect as it misconstrues the federal statute applicable to the instant claims. The claims process established at 12 U.S.C. §§ 1821(d)(3)-(9) specifically states that it was intended only for the FDIC and only when the FDIC was acting as a receiver for a failed bank. Defendant has not been able to point to any instance where the claims process was applied to an entity other than the FDIC, only to a line of holdings that allows the statute of limitations on assets purchased from the FDIC to be

> extended by 12 U.S.C. § 1821(d)(12). These cases in no way affect the Court's jurisdiction over the Plaintiff's claims.

[Id.] (internal citations omitted). The Plaintiff further argues that the "practical effect of the Defendant's reading of the statues at issue here would be a new precedent which would result in an avalanche of claims against the FDIC which were not contemplated by legislators as evidenced by the fact that Defendants have been unable to locate a precedent that is analogous to the case at bar." [Id.]

### *Overview of the FIRREA Claims Process and Exhaustion Requirement*

The FIRREA includes an exhaustion requirement that applies to claims made against the assets of a failed depository institution that is in FDIC receivership. See 12 U.S.C. § 1821(d)(5) (Procedures for determinations of claims); § 1821(d)(13)(D) (Limitation on judicial review). The statute allows a claimant to obtain judicial review of an FDIC claim determination if the claimant files a claim with the FDIC, receives a "disallowance" of the claim, and then files suit in a district court within 60 days after the FDIC's disallowance of the claim. See id. §§ 1821(d)(5)(A), (6)(A). Notably, the FIRREA makes a distinction between claimants whose names appear and whose names fail to appear on the books of a failed financial institution.

> For claimants whose names appear on the books of a failed financial institution, the statute sets forth a relatively straightforward administrative review process. Upon being appointed receiver, the FIRREA requires that the FDIC "promptly publish notice to creditors" that they must present

> their claims to the FDIC, together with proof, within a stated period (not less than 90 days) of the publication of the notice (the "bar date"). The FDIC must also mail a notice containing the same information to the creditor's last address appearing on the books of the failed financial institution. The creditor may then file a claim with the FDIC by the bar date and will receive a determination within 180 days (or a longer period agreed to by the claimant and the FDIC). If the claim is disallowed, the creditor may undertake an administrative appeal of the disallowance or file suit in a district court within 60 days.

Carlyle Towers Condominium Ass'n, Inc. v. FDIC, 170 F.3d 301, 305 (2d Cir., 1999) (internal citations omitted). For claimants whose names do not appear on a failed financial institution's books, the statute is noted as less precise:

> Within 30 days of discovering the "name and address of a claimant not appearing on the institution's books," the FDIC must mail to the newly discovered creditor a notice "similar" to the notice published pursuant to subsection (3)(B)(i). The FDIC has interpreted the requirement of "similar" notice to provide a 90-day period for creditors discovered after the bar date to file their claims. [Lastly], [t]he FIRREA also limits claims that may be allowed if filed after the bar date. "Claims filed after the [bar] date . . . shall be disallowed and such disallowance shall be final" except for [certain exceptions.]

Id. (internal citations omitted).

> FIRREA provides:

> Claims filed after the bar date shall be disallowed and such disallowance shall be final except that the receiver may allow the claim if (I) the claimant did not receive notice of the appointment of the receiver in time to file such claim before such [bar] date; and (II) such claim is filed in time to permit payment of such claim.

Id. (internal citations omitted) (alteration in the original).

Further, the FIRREA places an express limitation upon a district court's review of claims that have not proceeded through the described FDIC claims review process prior to bringing suit. § 1821(d)(13)(D) reads:

> (D) Limitation on judicial review. Except as otherwise provided in this subsection, *no Court shall have jurisdiction over* -
>> (i) any claim or action for payment from, *or any action seeking determination of rights with respect to, the assets of any depository institution for which the Corporation has been appointed receiver*, including assets which the Corporation may acquire from itself as such receiver; *or*
>> (ii) *any claim relating to any act or omission of such* [failed] *institution* or the Corporation as receiver.

12 U.S.C. § 1821(d)(13)(D) (emphasis added). The Second Circuit has held that "section 1821(d)(13)(D), when read in conjunction with the rest of section 1821(d), creates a requirement that all claims be presented to the FDIC before a claimant may seek judicial review." Carlyle Towers, 170 F.3d at 307; See also Resolution Trust Corp. v. Elman, 949 F.2d 624, 627 (2d Cir. 1991).

### Applicability of the FIRREA Claims Process and Exhaustion Requirement to the Plaintiff's Claims

While the FIRREA dictates that the FDIC is protected from suit over an asset from a failed bank until a plaintiff has exhausted the FDIC's claim procedures, and that the Court lacks jurisdiction over claims relating to acts or omissions of a failed bank, the statute does not clearly address the Defendant's proposed interpretation that Chase as a subsequent purchaser

of the assets of a failed financial institution, such as WAMU, automatically benefits from § 1821(d)(13)(D)'s limitation on judicial review as a right that is incidental to a note that has been acquired from the FDIC. The Defendant notes that in prior cases, this Court and the Connecticut Appellate Court have applied state principles of assignment to determine whether subsequent purchasers of assets were entitled to the rights, benefits, and remedies that the FIRREA confers upon the FDIC. The Court finds that the Defendant's characterization of these past cases is overreaching.

This Court has indeed looked to Connecticut law to determine whether the statute of limitations specified in the FIRREA for claims brought by the FDIC applied to a plaintiff who was an assignee that purchased defaulted assets from the FDIC . See Joslin v. Grossman, 107 F. Supp. 2d 150 (D.Conn. 2000); see also Hardy v. New York City Health & Hosp. Corp., 164 F.3d 789, 793 (2d Cir. 1999) (noting that "when a federal action is brought in federal court, the court has discretion to borrow from state law when there are deficiencies in the federal statutory scheme.") In Joslin, due to the absence of a clear statement in the FIRREA, the Court followed the lead of other courts that have relied on state law to settle the ambiguity:

> Because the FIRREA is silent as to whether the extended limitations period applies to assignees who purchase defaulted assets from the FDIC, a number of courts have turned to state law and common-law principles governing assignments to resolve the issue. The Fifth Circuit relied on [federal] common law principles to fill in the statutory gap, and

found that an assignee stands in the shoes of his assignor. The Fourth Circuit, however, rejected the rationale of [the Fifth Circuit], and determined that an assignee does not automatically enjoy the benefit of the FIRREA statute of limitations.

Joslin, 107 F. Supp. 2d at 155-56 (citations and quotation marks omitted).

Noting the Fourth Circuit's guidance that courts should look to state law, the Court further explained:

Connecticut has followed the holding in [the Fourth Circuit], and looked to its own law governing the rights of assignees of the FDIC.  It is well established, in Connecticut, "that an assignee stands in the shoes of the assignor" . . . "Because the plaintiff stands in the shoes of the FDIC by virtue of the assignment, the plaintiff is vested with all the FDIC's rights, remedies and benefits that are incidental to the note.  Thus, it would appear that the plaintiff should also receive the benefit of the extended limitations period."

Id. at 156 (quoting National Loan Investors Ltd. P'ship v. Heritage Square Assocs., 733 A.2d 876, 879-80 (Conn. App. Ct. 1999).

In the instant case, WAMU executed the loan at issue to the Plaintiff. WAMU subsequently failed and the FDIC was appointed a receiver.  Under the ownership of the FDIC, all of the assets became subject to all provisions of the FIRREA.  The Defendant contends that when the FDIC sold the failed bank's assets to Chase, Chase became an assignee of the FDIC and "[stepped] in the shoes of the FDIC by virtue of the assignment." National Loan Investors, 733 A.2d at 880.  The Defendant contends that Chase is therefore vested with all of the FDIC's rights, remedies, and benefits that are incidental to the note pursuant to Joslin and National Loan Investors, including the claims exhaustion requirement of 12 U.S.C. §

1821(d)(13)(D) that would deprive this Court of jurisdiction until the Plaintiff exhausted the FIRREA claim process administrative remedies.  The Plaintiff correctly notes however, that Joslin and National Loan Investors, reflects "a line of holdings that allows the statute of limitations on assets purchased from the FDIC to be extended by 12 U.S.C. § 1821(d)(12)." [Doc. #16].  Joslin and National Loan Investors only presented whether the FIRREA's statute of limitations applied to their proceedings.  While both opinions observed more generally that, as an assignee, a "plaintiff is vested all of the FDIC's rights, remedies and benefits that are incidental to the note," Joslin, 107 F. Supp. 2d at 156; National Loan Investors, 753 A.2d at 880, it does not necessarily follow that an assignee would necessarily benefit from a jurisdictional bar that congress reserved for a special entity such as the FDIC.  The jurisdictional bar is incidental to the deposit insurance system but not to each note acquired by a bank prior to its insolvency. The Court will therefore turn to principles of statutory interpretation to resolve this ambiguity.

Where a statute is silent on an issue or unclear, the Court applies established principles of statutory construction:

> In interpreting a statute, [courts] look first to the language of the statute itself . . . When the terms of a statute are ambiguous, however, [courts] may seek guidance in the legislative history and purpose of the statute. In so doing, [courts] must construct an interpretation that comports with the statute's primary purpose and does not lead to anomalous or unreasonable results.

Marvel Characters, Inc. v. Simon, 310 F.3d 280, 289-90 (2d Cir. 2002) (internal citations and quotation marks omitted).

"The primary purpose underlying FIRREA's exhaustion scheme is to allow [the FDIC] to perform its statutory function of promptly determining claims so as to quickly and efficiently resolve claims against a failed institution without resorting to litigation."  Rosa v. Resolution Trust Corp., 938 F.2d 383, 396 (3d Cir. 1991) (citing H.R. Rep. No. 101-54(I), 101st Cong., 1st Sess. 418-19, reprinted in 1989 U.S.C.C.A.N. 86, 214-15).  Further, "the FIRREA was explicitly drafted to satisfy the procedural shortcomings of administrative review identified by the Supreme Court in [Coit Independence Joint Venture v. Federal Sav. & Loan Ins. Corp., 489 U.S. 561 (1989).]  In so doing, Congress expressly withdrew jurisdiction from all courts over any claim to a failed bank's assets made outside the procedures established in §1821."  F.D.I.C. v. Vernon Real Estate Invs., Ltd., 798 F. Supp. 1009, 1017 (S.D.N.Y., 1992).

The claims exhaustion requirement therefore reflects the FDIC's powers as a receiver of failed assets and the FDIC's need "to dispose of the bulk of claims against failed financial institutions expeditiously and fairly."  H.R. Rep. No. 54(I), 101st Cong., 1st Sess. 419 (1989), reprinted in 1989 U.S.C.C.A.N. 86, 215.  Notably, included in the FDIC's powers as receiver is the authority to "transfer any asset or liability of the institution in default . . ." 12 U.S.C. § 1821(d)(2)(G)(i)(II).  Accordingly, the FDIC is empowered to determine which assets and liabilities of a failed bank are to

14

be sold and transferred, and which assets it should keep.  Such a design "facilitates the sale of a failed institution's assets (and thus helps to minimize the government's financial exposure) by allowing the [FDIC] to absorb liabilities itself and guarantee potential purchasers that the assets they buy are not encumbered by additional financial obligations."  Payne v. Security Sav. & Loan Ass'n, F.A., 924 F.2d 109, 111 (7th Cir. 1991) (Where the court analyzed analogous provisions of the FIRREA and highlighted the significance of purchase and assumption agreements to conclude that the Resolution Trust Corporation, and not the subsequent purchaser of the assets of a failed savings and loan association, was the proper successor to liability created by an age discrimination judgment against the failed institution).  It is this intermediate step, the FDIC's ability to designate specific assets and liabilities for purchase and assumption that reflects a distinction between the FDIC and a subsequent purchaser, and why a subsequent purchaser does not necessarily benefit from the FDIC's claim exhaustion process.  Instead a Court should look to the purchase and assumption agreement governing the transfer of assets between the FDIC and a subsequent purchaser of assets of a failed bank to determine which assets and corresponding liabilities are being assumed.  Absent a transfer of liability by the FDIC and assumption of liability by a subsequent purchaser, such as Chase, the liability remains with the FDIC and subject to the claim exhaustion procedures.

The September 25, 2008 Purchase and Assumption Agreement

between Chase and the FDIC explicitly reserved liability for the FDIC:

> 2.5 <u>Borrower Claims.</u> Notwithstanding anything to the contrary of this Agreement, any liability associated with borrower claims for payment of or liability to any borrower for monetary relief, or that provide for any other form of relief to any borrower … related in any way to any loan or commitment to lend made by the Failed Bank [WAMU] prior to failure … or otherwise arising in connection with the Failed Bank's lending or loan purchase activities are specifically not assumed by the Assuming Bank.

[Doc. # 17, Exh. D2]; <u>see</u> <u>also</u>

www.fdic.gov/about/freedom/washington_mutual_p_and_a.pdf.  The

Court can consider the Purchase and Assumption Agreement, as a

district court may examine evidence outside of the pleadings when

determining jurisdiction pursuant to Rule 12(b)(1).  <u>See</u> <u>Zappia Middle</u>

<u>E. Constr. Co. v. Emirate of Abu Dhabi</u>, 215 F.3d 247, 253 (2d Cir. 2000)

(district courts "may resolve the disputed jurisdictional fact issues by

referring to evidence outside of the pleadings, such as affidavits, and

if necessary, hold an evidentiary hearing.")   Further, it is appropriate

to consider this document as it is a public document that the

Defendant had knowledge of, as the Plaintiff not only makes reference

to the FDIC's sale of WAMU and its subsidiaries to Chase in his

Complaint, but also makes direct reference to a section of the

Purchase and Assumption Agreement in its Memorandum in

Opposition to the Defendant's instant motion [Docs. 1 & 16].  <u>See</u>

<u>Cortec Indus. Inc. v. Sum Holding L.P.</u>, 949 F.2d 42, 48 (2d Cir. 1991)

("Despite the fact that the documents attached to [defendant's] motion to dismiss were neither public disclosure documents required by law to be filed with the SEC, nor documents actually filed with the SEC, nor attached as exhibits to the complaint or incorporated by reference in it, the district court was entitled to consider them in deciding the motion to dismiss.  The [documents in question] were documents plaintiffs had either in its possession or had knowledge of and upon which they relied in bringing suit.")

Various courts have recently reviewed the efficacy of this very Purchase and Assumption Agreement clause between the FDIC and Chase:

> The Court agrees with Judge Stewart [of the District of Utah], who, in an almost identical case to this one, interpreted the same P & A Agreement to mean that Chase is shielded from liability for borrower claims.  Plaintiff argues that Judge Stewart's decision would allow one party to a contract, by agreement with a stranger to the contract, to extinguish the contractual, statutory and constitutional rights of the other party to the contract.  This is simply not the case . . . the court agrees, that the P & A Agreement expressly provides that Chase did not assume borrower claims against WaMu arising prior to September 25, 2008.  Liability for borrower claims remained with the FDIC-Receiver.  Consequently, any existing claims that plaintiff may properly assert under its loan contract should be pursued with the FDIC-Receiver and not against Chase.  Plaintiffs' rights under the contract were not extinguished; they are simply not enforceable against Chase.

Aragon v. F.D.I.C., No. 2:09CV793DS,  2010 WL 331907 at *1 (D. Utah, January 28, 2010) (internal citation and quotation marks omitted).

A district court reached a similar finding in Moldenhauer v. F.D.I.C., No. 2:09-CV-00756 TS, 2010 WL 1064422 (D. Utah, March 18, 2010).  In

**Moldenhauer**, where the plaintiff sued both the FDIC and Chase in connection with an $840,000 loan executed by WAMU, the court first noted that for an action against the FDIC, "[e]xhaustion of administrative remedies is mandatory where Congress has provided such remedies" and dismissed the claim pursuant to Fed. R. Civ. P. 12(b)(1). **Id.** at *2. With regard to the claim against Chase, the Court found that because the "claims all relate[d] to a loan made before September 25, 2008, Plaintiff ha[d] not stated a claim against Chase because Chase expressly did not assume the liability for which Plaintiffs s[ought] to recover." **Id.** Under similar reasoning, the Court finds that the language of the parties' Purchase and Assumption agreement is dispositive and that Chase did not assume liabilities against WAMU arising from its lending or loan purchase activities prior to September 25, 2008, and that those liabilities remained with the FDIC as receiver, and subject to the FDIC's jurisdictional claim exhaustion requirements.

The Purchase and Assumption agreement also notes, in section 2.1, however that notwithstanding other sections of the agreement, that "the Assuming Bank specifically assumes all mortgage servicing rights and obligations of the Failed Bank." [Doc. # 17, Exh. D2]. Mortgage servicing typically refers to the "administrative tasks associated with collecting mortgage payments." **Morrison v. National Australia Bank Ltd.**, 130 S. Ct. 2869, 2875 (2010) (citing to J. Rosenberg, Dictionary of Banking and Financial Services 600 (2d. ed. 1985)). In considering the Complaint

pursuant to Rule 12(b)(1), the Court must therefore distinguish between claims relating to lending activities as distinguished from claims relating to mortgage servicing. As a result the Court lacks jurisdiction over any of Caires' allegations regarding the origination and formation of the loan and mortgage by and between Caires and WAMU, but retains jurisdiction over allegations regarding the servicing of Caires mortgage by Chase. The Defendant's motion to dismiss made pursuant to Rule 12(b)(1) is therefore granted as each of the Plaintiff's causes of actions rely, at least in part, on actions taken and statements made by WAMU employees in connection with the finalization and issuance of Caires' mortgage agreement. As each of the counts in Caires complaint also refer to actions taken by Chase employees possibly after the date of the Purchase and Assumption Agreement and actions taken by Chase employees in relation to the servicing of the Plaintiff's loan agreement, but fails to clearly delineate the timing and responsible party for these alleged misdeeds, the Plaintiff's case is dismissed without prejudice to the Plaintiff's right to file an amended complaint that limits its causes of actions to allegations regarding the servicing of the Plaintiff's loan agreement that are not subject to the FDIC's claim exhaustion requirements within fourteen days of this decision.

**B) The Defendant's Motion to Dismiss Pursuant to Rule 12(b)(6)**

The Defendant also seeks to dismiss the Plaintiff's claims pursuant

to rule 12(b)(6) for failure to state a cause of action upon which relief can

be granted:

> Even if this Court has jurisdiction over the subject matter of
> this case, the Plaintiff has failed to allege any facts that would
> support a cause of action against the Defendant. The entire
> Complaint is based on allegations that WAMU, the Defendant,
> and WAMU and the Defendant together, engaged in oral
> communications and entered into oral agreements with the
> Plaintiff that changed the written terms of the Loan. However,
> even if this Court assumes that such allegations are true, they
> are insufficient to support a claim under <u>D'Oench Duhme</u>.
> There are no allegations in the Complaint – as are required to
> maintain a cause of action – that any of these alleged oral
> agreements were: (1) reduced to writing; (2) which writing was
> executed by WAMU; (3) which writing was approved by
> WAMU's board of directors; and (4) which writing is and did
> become an official record of WAMU's. As a result, the Plaintiff
> has failed to state a claim upon which this Court can grant
> relief and the Complaint should be dismissed in its entirety.

[Doc. #13]. In response, the Plaintiff contends that the doctrine of <u>D'Oench,</u>

<u>Duhme</u> does not apply to the assignee of an asset that passed through the

FDIC, and that the Defendant stepped in the shoes of the failed bank in

regard to the purchased assets and not the shoes of the FDIC and therefore

cannot rely on the powers of the FDIC.

The <u>D'Oench, Duhme</u> doctrine based on the 1942 United States

Supreme Court case and subsequent judicial interpretation and legislative

codification, invalidates certain agreements made between a bank's

representatives and borrowers, prior to the FDIC's appointment as a

receiver for that failed institution, to modify the terms of a promissory note,

unless the agreement meets certain requirements, including being reduced to writing. See D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447 (1942). The Second Circuit has explained, in detail, the development of the D'Oench, Duhme doctrine, its subsequent codification, and its application to assets acquired by the FDIC:

> In D'Oench, Duhme & Co. v. FDIC, the Supreme Court established a doctrine that precludes persons who have lent themselves "to a scheme or arrangement whereby the banking authority on which the [FDIC] relied in insuring the bank was or was likely to be misled," from raising a defense to a collection action brought by the FDIC as the receiver of the failed bank based on the misleading scheme or arrangement . . . In Langley v. FDIC, the Supreme Court considered the scope of the D'Oench, Duhme doctrine as codified at 12 U.S.C. § 1823(e) and held that "[a] condition to payment of a note, including the truth of an express warranty, is part of the 'agreement' to which the writing, approval, and filing requirements of 12 U.S.C. § 1823(e) attach." In 1989, after the Supreme Court had decided Langley, Congress further enlarged the scope of the doctrine by amending § 1823(e) to extend its protections to assets acquired by the FDIC through appointment as a receiver for an insolvent financial institution.

F.D.I.C. v. Giammettei, 34 F.3d 51, 55 (2d Cir. 1994) (internal citations omitted). The codification of that doctrine in FIRREA provides:

> No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [FDIC] unless such agreement-
>
> > (A) is in writing,
> >
> > (B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

      (C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

      (D) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C. § 1823(e)(1).

In <u>Langley</u>, The Supreme Court noted a key purpose of the <u>D'Oench, Duhme</u> doctrine:

> One purpose of § 1823(e) is to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets. Such evaluations are necessary when a bank is examined for fiscal soundness by state or federal authorities, and when the FDIC is deciding whether to liquidate a failed bank, or to provide financing for purchase of its assets (and assumption of its liabilities) by another bank. The last kind of evaluation, in particular, must be made with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services. Neither the FDIC nor state banking authorities would be able to make reliable evaluations if bank records contained seemingly unqualified notes that are in fact subject to undisclosed conditions.

<u>Langley v. Federal Deposit Ins. Corp.</u>, 484 U.S. 86, 91-92 (1987), (internal citations and quotation marks omitted).

Several Courts have noted that the <u>D'Oench, Duhme</u> doctrine applies to assignees of the FDIC:

> Courts have expanded the application of this doctrine. First, it is not limited to the FDIC in its corporate capacity as the insurer of a failed institution's deposits. The FDIC may also assert the doctrine in its capacity as the receiver of the failed institution. Second, bridge banks may assert the doctrine as the assignees of the FDIC as the receiver of the failed institution.

**Fleet Bank of Maine v. Steeves**, 785 F. Supp. 209, 213 (D. Maine 1992)

(listing authorities noting that banks acting as assignees of the FDIC as a

failed institution may assert the **D'Oench**, **Duhme** doctrine); **see also** **Porras**

**v. Petroplex Sav. Ass'n**, 903 F. 2d 379, 380-81 (5th Cir. 1990) ("The preferred

method of ensuring that depositors are paid is through the use of purchase

and assumption agreements . . . Recognizing this, we recently extended

**D'Oench, Duhme** to 'assignees of the FDIC.'"); **see also** **AAI Recoveries,**

**Inc. v. Pijuan**, 13 F. Supp. 2d 448, 451 (S.D.N.Y., 1998) ("Although Congress

only codified the **D'Oench, Duhme** doctrine with regard to the FDIC, courts

have extended the rule to include third party assignees and transferees . . .

Therefore, AAI, as a successor in interest to the FDIC, is entitled to the

protection of the **D'Oench, Duhme** doctrine in the instant case."); **see also**

**OCI Mortg. Corp. v. Marchese**, 774 A.2d 940, 943 n. 7 (Conn. 2001)

("Although not a disputed issue in the present case, it is generally

recognized that third party transferees and assignees of the Federal

Deposit Insurance Corporation and Resolution Trust enjoy the same

protections of 12 U.S.C. § 1823(e) and the **D'Oench**, **Duhme** doctrine.")  This

Court agrees with the line of reasoning promulgated by these courts, and

notes in particular that allowing parties to assert oral agreements, or

agreements that otherwise fail to meet the requirements of the **D'Oench,**

**Duhme** doctrine against a purchaser would diminish the value of assets

that the FDIC seeks to sell and undermine the deposit insurance system.

As noted by the Fifth Circuit:

> A primary duty of the FDIC and FSLIC is to pay depositors of failed financial institutions . . . Purchase and assumption agreements are preferred because they minimize the corporations' losses, expand the purchasing institutions' opportunities at low risk, and protect depositors. D'Oench, Duhme promotes purchase and assumption transactions by offering the purchaser protection from secret agreements that tend to affect adversely its rights in the instruments that it acquires. Extending D'Oench, Duhme to transferees of assets from the FSLIC [and the FDIC], therefore, provides the FSLIC [and the FDIC] with greater opportunity to protect the failed institutions' assets.

Porras, 903 F.2d at 380-81(internal citations omitted).

Accordingly, the Court finds that the Defendant is entitled to the protections of the D'Oench, Duhme doctrine and 12 U.S.C. § 1823(e) as an assignee of the FDIC and that Chase is not subject to any agreements, other than Caires' mortgage agreement, made prior to WAMU being placed in receivership of the FDIC, unless they meet the requirements of § 1823(e), including being reduced to writing. As in the discussion of the Defendant's motion to dismiss made pursuant to Rule 12(b)(1), the Court notes that the Plaintiff's Complaint fails to properly delineate the timing of alleged statements and agreements made by WAMU and Chase employees. Further, the Plaintiff fails to note if and how any subsequent communications altered the terms of his mortgage despite the existence of a written mortgage agreement, and more importantly whether such communications or subsequent agreements complied with the requirements of 12 U.S.C. § 1823(e). Accordingly, the Defendant's motion to dismiss made pursuant to Rule 12(b)(6) is also granted, without prejudice to the Plaintiff's right to file an amended complaint within

fourteen days of this decision that provides sufficient factual detail for the Court to conclude whether any alleged agreements forming the basis of Plaintiff's claims, made subsequent to the initial mortgage closing but prior to Chase's purchase and assumption of WAMU's assets comply with the D'Oench, Duhme doctrine as codified in the four requirements enumerated in 12 U.S.C. § 1823(e).

IV. Conclusion

Chase's motions to dismiss made pursuant to Fed. R. Civ. P 12(b)(1) and Fed. R. Civ. P. 12(b)(6) [Doc. #12] are GRANTED, and this case will be closed unless the Plaintiff files an amended complaint in compliance with the Court's foregoing instruction by October 14, 2010.

IT IS SO ORDERED.

_____/s/_____
Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: September 30, 2010