UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

RICHARD CAIRES                     :
    PLAINTIFF,                 :
                               : CIVIL ACTION NO. 3:09cv2142(VLB)
                               :
    v.                         : JULY 23, 2012
                               :
JPMORGAN CHASE BANK, N.A           :
    DEFENDANT.                 :

## MEMORANDUM OF DECISION GRANTING DEFENDANT'S [DKT. #79] MOTION TO DISMISS

The Defendant JP Morgan Chase Bank, N.A. ("Chase") has moved to dismiss the Plaintiff Richard Caires's ("Caires") amended complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. In the amended complaint, Caires asserts causes of action for Connecticut's Unfair Trade Practices Act ("CUTPA") Conn. Gen. Stat. §42-110b et. seq, breach of the covenant of good faith and fair dealing, and unjust enrichment. For the foregoing reasons, the Court GRANTS Defendant's motion to dismiss.

### Procedural Background

On December 30, 2009, Chase removed this case from Connecticut Superior Court to this Court. *See* [Dkt. #1]. In the original complaint, Caires asserted claims for fraud in the inducement, equitable estoppel, and CUTPA. [*Id.*]. On January 22, 2010, Chase moved to dismiss the complaint on the basis that the Court lacked jurisdiction as a result of Caires's failure to timely exhaust FIRREA's administrative claims process and on the basis of the D'oench Duhme Doctrine. On September 30, 2010, the Court granted the Defendant's motion to

dismiss without prejudice to filing an amended complaint in compliance with the Court's order.  The Court held that FIRREA barred any claims that stemmed from WAMU's pre-failure conduct but would not bar claims based on actions taken by Chase employees after Chase purchased WAMU's assets.  [Dkt. #23]. Since Plaintiff's complaint failed to clearly delineate timing and the responsible parties for the alleged misdeeds, the Court permitted Caires to amend the complaint to "limits its causes of actions to allegations regarding the servicing of the Plaintiff's loan agreement that are not subject to the FDIC's claim exhaustion requirements."  [*Id.*].

On October 14, 2010, Caires filed an amended complaint asserting claims for fraud in the administration of the loan, equitable estoppel, and CUTPA.  [Dkt. #25].  On November 19, 2010, Chase filed a motion to dismiss the amended complaint based on FIRREA and failure to state a claim.  [Dkt. #36].  On June 23, 2011, the Court held a status conference with the parties.  After the conference, the Court struck Plaintiff's amended complaint in its entirety pursuant to Fed. R. Civ. P. 12(f) as Plaintiff failed to state claims with specificity and consistency with the actual facts which form the basis of those claims as admitted at the Parties' 6/23/2011 status conference and permitted the Plaintiff to file a second amended complaint.  [Dkt. #64].  On July 7, 2011, Caires filed his second amended complaint. [Dkt. #67].  On September 28, 2011, Chase moved to dismiss the second amended complaint which is pending before the Court.

**Factual Allegations**

The following facts are taken from Caires's second amended complaint. On December 11, 2006, Caires purchased 634 North Street, Greenwich, CT and entered into an Adjustable Rate Purchase Money Mortgage and a Home Equity Line of Credit ("HELOC") with Washington Mutual Bank ("WAMU") with regard to this property.  [Dkt. #67, Second Amended Complaint ("SAC") at ¶¶ 8, 43].

In August of 2007, Caires entered into a Residential Construction /Permanent Loan agreement with WAMU for $5.5 million.  [*Id.* at ¶ 44].  Plaintiff alleges that the loan combined a "high interest rate construction loan and an adjustable rate permanent loan."  *Id.*  Plaintiff further alleges that during the construction phase, the Residential Construction Loan Agreement provisions controlled over any conflicting provision and that for the 18 month construction phase WAMU would be paid interest of only $27,588 per month.  [*Id.* at ¶45].  Plaintiff further alleges that "[e]ach payment would be advanced by the bank from an interest reserve account ie: [sic] a segregated portion of the loan amount from which the bank would pay itself and that the bank would also advance funds during the construction period pursuant to a draw schedule and a "detailed builder's agreement to pay the contractors and materials." *Id.*  Plaintiff alleges that the bank had established an interest reserve fund of $424,575 from the loan proceeds and a contingency fund of $100,000. [*Id.* at ¶ 45].

Caires alleges that "i[f] the project was not completed within 18 months, Caires could request an extension of the construction phase, pay a fee of a ¼ point of the loan amount and continue to use the funds in the interest reserve

3

account to pay the monthly interest only payments to the bank." [*Id.* at ¶ 47].
Caires asserts "that the interest rate during the first 18 month period of
construction or to the date of Caires's Certificate of Occupancy would be 8.5%"
and that "[w]hen Caires got the Certificate of Occupancy and provided other
documentation, the loan would exit the construction phase and become a 6 year
adjustable rate mortgage ("arm") fixed to the 2 year Treasury rate plus 2%.  The
new interest would commence on the first day of the second month after the final
advance was paid." [*Id.* at ¶ 48].

On September 25, 2008, the United States Office of Thrift Supervision
("OTS") seized WAMU and placed it into the receivership of the Federal Deposit
Insurance Corporation ("FDIC").  [*Id.* at ¶ 10].  The FDIC then sold WAMU and its
assets to the defendant, JP Morgan Chase Bank ("Chase").  *Id.*  Caires alleges
that, once Chase had acquired WAMU and its assets, many of WAMU's
employees were terminated and Caires had no one he could speak to regarding
his finances.  [*Id.* at ¶ 49].

Caires alleges that he was told "initially and after Chase took over
servicing his account that if he required more time to complete the construction
project it was not a problem and the reserve account, if it still had money in it
would continue to pay the loan servicing."  [*Id.* at ¶ 50].

Caires further alleges on January 26, 2009, he informed Chase that he
anticipated that he would breach the loan agreement as he was not going to
finish construction by February 1 and would need a loan modification to extend
the construction phase by two months.  [*Id.* at ¶ 51].

On February 9, 2099, Caires further alleges that he "reiterated his need for an extension" and emailed to Nancy Lam at Chase. [*Id*. at ¶ 52]. Caires then received a letter from Nancy Lam at "WAMU/Chase outlining the documents and approvals he would need to receive the final advance and to convert to a permanent loan." [*Id*. at ¶ 53]. Ciares does not specify the date of date of the letter or the date on which he received it. Caires alleges that Lam's response was "confusing" and that he had difficulty obtaining clarification from Chase regarding whether "Chase would waive the [extension] fee because he was frequently placed on hold for long periods of time and only rarely was able to speak to the same Chase representative twice." [*Id*. at ¶ 53].

On February 21, 2009, Caires alleges that he emailed Lam because he had called "several times without a response to inquire why his draw request [for Chase to advance more funds] had not been acted on and when could he expect a response regarding the extension." *Id*. at ¶ 54. Chase apparently engaged an inspector to inspect the construction site. On February 24, 2009 Caries alleges that Lam informed him "that the inspection report has certain items less completed than he had indicated" and so they "agree to pay per the inspection and Caires w[ould] submit a new draw request for the remainder which he [did] on February 28, 2009." [*Id*. at ¶ 55]. Caires further alleges that Lam reassured him that the extension should come through soon. [*Id*.].

On March 3, 2009, Caires alleges that he received a "Notice of Default" from Chase, informing him that he had defaulted on his loan by failing to complete the building project and that the interest on the loan would no longer be paid from the

interest reserve account.  [*Id*. at ¶ 56].  The "Notice of Default" gave Caires until April 2, 2009 to cure.  [*Id*.].  Caires does not state whether Chase accelerated the loan as a consequence of the default.  On March 10, 2009, Caires alleges that he exchanged emails with Nancy Lam and Lam informed him that extensions were no longer automatic upon payment of the extension fee and "that before the term extensions had been automatic but now they had a different directive."  [*Id*. at ¶ 57].  Caires alleges that he had "relied on the ability to extend the construction period when entering into the agreement and later because construction projects with as much custom components frequently were delayed."  [*Id*. at ¶ 58].  Caires does not allege that his loan agreement entitled him to automatic extensions or any other bases for this expectation.

Caires alleges that he responded to Lam by "pointing out that he had applied for the extension two months prior, he would not be able to pay his contractors and the default notice would harm his credit rating."  [*Id*. at ¶ 59].  Lam answered that "even though they had his request" for the extension, "his loan had matured" and she could not process his draw request.  [*Id*.].  Caries alleges that the "delay in processing Caires' extension request delayed Caries' ability to draw construction funding for several months and thereby depleting Caires' reserves yet again and throwing the entire completion of this project in jeopardy."  [*Id*.].  Caires cites no provision of the mortgage or note entitling him to a modification or modification fee waiver.  Nor does he cite any provision which entitled him to a decision within a certain period of time or right to further draws at that time.

Caires alleges that after his default in March and until August of 2009 he did not receive any statements from Chase and that he made payments on the mortgage in person at the bank branch.  [*Id*. at ¶ 60, 67].  Caires alleges that his July 2009 payment was not credited, causing "significant work to undo the late payment fee and notation."  [*Id*. at ¶ 67].  At the Ridgefield branch he spoke with Denise Manfro, the assistant manager, who he alleges spent six weeks from early March to mid-April 2009 calling various Chase departments in an attempt to determine the status of Caires' account.  [*Id*. at ¶¶ 60, 61].  Also during this six-week period, Caires alleges that  he asked Manfro "if he owed any monthly charges and asked for the amount of the fee" for the extension, and she informed him that he did not owe anything.  [*Id*. at ¶ 60].  When Caires pressed Manfro for more information over the course of several days, she eventually discovered "there was a shortage and a fee, causing Caires to narrowly avoid a late payment fee."  [*Id*.].  Caires also alleges that Manfro told him that his loan would convert to the lower interest rate once he had finished construction and received the Certificate of Occupancy.  [*Id*. at ¶ 61].  Caires does not state whether Manfro knew he was in default or whether she had been provided the default notice.  Nor does he state what department she worked in or what were her duties, responsibilities or authority.

On May 2, 2009, Caires alleges Chase offered him an extension on the construction phase of his loan on three conditions: (1) payment of a $26,816.87 fee; (2) the interest on the loan would no longer be paid from the interest reserve account; and (3) a loan reduction of $140,000.  [*Id*. at ¶ 62].  On May 5, 2009,

Caires "accepted the modification and reduction amount effective March 1, 2009." *Id.* at ¶ 63.  On May 12, 2009, Caires received an "unsigned letter" from Chase, detailing the documents required to complete the construction phase of his loan and referring to "the necessity of submitting the final draw request 7 days prior to March 1, 2009 the maturity date."  [*Id.* at ¶ 64].  The letter also mentioned a "retainage of $384,300.00 that would be released at the final draw."  [*Id.*].  Between May 12 and June of 2009, Caires alleges that Denise Manfro continued to tell him that the loan would convert to the lower interest rate once the construction was completed.  [*Id.* at ¶ 65].

Caires completed his building project, received the Certificate of Occupancy, and submitted all the necessary documents to move his loan out of the construction phase on June 24, 2009.  [*Id.*].  Caires also requested a final draw of $160,700.00 for "construction costs he had personally incurred to complete the project."  [*Id.* at ¶ 66].  On July 2, 2009, Chase refused to grant Caires' final draw request because, according to Chase, the value of Caires' property had dropped. [*Id.*].  Caires alleges that Chase gave him "no time warning that they intended to refuse this relied upon final draw and offered Caires no recourse to challenge their determination."  [*Id.*].  Chase, through a representative identified as "HIS", allegedly informed Caires that Chase would not convert his loan out of the construction phase if he did not accept a final draw of $62,000.00.  [*Id.*].

On August 12, 2009, Caires received notice from Chase that Chase would not convert the loan to the lower interest rate.  [*Id.* at ¶ 68].  Caires alleges that he asked Denise Manfro about her earlier assurances that the interest rate would

convert.  Manfro remembered making the assurances but could not remember where she had gotten that information.  [*Id.*].  Caires also alleges that he called Chase's service department, went to his local Chase branch, and a person in servicing eventually informed him that "the note did not require the bank to lower the interest rate but he could try to refinance the loan elsewhere."  [*Id.* at ¶ 69].  Between September and October of 2009, Caires alleges that he received letters from Chase telling him that "an outside agency would assist him in applying for a modification and that his WAMU loan was eligible for emergency mortgage assistance."  [*Id.* at ¶ 70].  Caires alleges that he submitted the "documents requested" on numerous occasions but "was continually told something else was needed."  [*Id.* at ¶ 71].

In the amended complaint, Caires makes various allegations regarding the housing market crisis citing various news sources about the increase in foreclosures and how the federal government has taken measures to curtail abuses by mortgage servicers.  [*Id.* at ¶¶ 11-13].  Caires also makes a series of allegations about "Chase's impact on mortgagors" during the housing crisis and alleges that Chase violated "core statutes in Connecticut intended to protect consumers, including mortgagors, as well as engaged in numerous common law breaches, enriching itself at the expense of mortgagors and even investors."  [*Id.* at ¶¶ 18-13].

Caries also alleges that Federal Regulators have found that Chase has engaged in mortgage servicing abuses.  Caries alleges that on July 31, 2009, Chase executed a Servicer Participation Agreement ("SPA") with the federal

government (Fannie Mae), agreeing that it would comply with "all applicable Federal, State and local laws, specifically including state laws designed to prevent unfair, discriminatory or predatory lending practices."  [*Id.* at ¶ 29].  The SPA expressly states that it is for the Home Affordable Modification Program under the Emergency Economic Stabilization Act of 2008.  [Dkt. #67, Ex. I].  In the recitals, the SPA indicates that the U.S. Department of the Treasury has established a Home Affordable Modification Program ("HAMP") and that Fannie Mae has been designated by Treasury as a financial agent in connection with the implementation of the program.  [*Id.*].  Caires alleges that the "SPA mandates that a participating servicer follow all guidelines, procedures, and directives issued" and "will use a uniform loan modification process to provide a borrower with sustainable monthly payments."  [Dkt. #67, SAC at ¶ 30].  Caires alleges that by signing the SPA Chase was legally bound to comply with these guidelines.  [*Id.* at ¶34].

On April 13, 2011, Caires alleges that the Federal Reserve and the OCC announced a consent order with Chase, in which they determined that Chase engaged in "unsafe or unsound banking practices."  [*Id.* at ¶ 24-25].  Caires alleges that a "key provision of the Federal Reserve Consent Order is that Chase must insure that illegal or 'otherwise unreasonable' fees – such as unnecessary, unsubstantiated, excessive or bogus fees for services that were never performed – assessed against mortgagors are detected."  [*Id.* at ¶26].  Caires further allege that "Chase routinely fails to meet its obligations under its contract with the

Federal Government – obligations that were incurred for the benefit of mortgagors such as the Plaintiff."  [*Id.* at ¶37].

Caires alleges five causes of action in his amended complaint.  In each cause of action, Caires makes specific allegations with respect to that cause of action and also states that he incorporates by reference all of the general allegations that he has pled prior in the amended complaint into each cause of action.

The Plaintiff and WAMU entered into the subject Residential Construction Loan Agreement and ancillary documents governing the Plaintiff's rights and the Defendant's obligations relative to the issues in this case.  See [Dkt. #67, Exhibits A-L].  These loan documents obligated the Plaintiff to pay interest at a rate of 8.5% per annum from the inception of the loan to September 1, 2012.  [*Id.* at Ex. B at p. 1-2].  During the construction period, the Plaintiff was required to pay interest only.  [*Id.* at Ex. A at p. 5; Ex. C at p. 1-2].  The interest was to be paid out of an interest reserve funded by the principal.  [*Id.* at Ex. A at p. 5].  The Plaintiff covenanted and warranted that he would complete the construction no later than February 1, 2009.  [*Id.* at p. 12].  After the completion of the construction and presentment of a certificate of occupancy by the Plaintiff to the Defendant, the Plaintiff was allowed to "rollover" or convert the construction loan into a permanent loan.  [*Id.* at Ex. C at p.1].  More than three and a half years after the anticipated completion of construction, the interest rate on the loan was subject to adjustment higher or lower based on an index.  [*Id.* at Ex. B at p.1-3].  The adjustment was to occur annual commencing September 1, 2012.  [*Id.*].  The

maximum interest rate adjustment higher or lower in any year was 2% and the interest rate could never exceed 11.960%.  [*Id.*].

i.      *First Cause of Action – CUTPA*

Caires alleges as a first cause of action that Chase has violated and continues to violate CUTPA by "breaching Chase's Agreement with Fannie Mae of which the Plaintiff is the intended beneficiary" and by "violating the Consent Orders issued by the OCC and the Federal Reserve…in numerous ways and by continuing to engage in practices that are prohibited by the orders and/or failing to implement the changes demanded by the regulators."  [*Id.* at ¶ 77].  Caires further alleges that Chase has violated CUTPA by the following actions:

> …refusing to convert [Caires'] loan to the lower interest rate promised in the loan documents; failed to take reasonable steps to work with Plaintiff including taking months to render a decision on his extension request; misrepresented the status of extension and draw request applications; repeatedly requested duplicative financial information; erected artificial obstacles in the evaluation process to obstruct, delay and/or prevent a timely decision; failed to keep accurate records of mortgagor accounts, including accounting information requested by Plaintiff; charged excessive and unreasonable fees; inexplicably and arbitrarily increased mortgagor debt obligations; failed to properly apply mortgagor payments in whole or in part; rejected payments entirely without justification; caused improper interest and other fees to accrue; breached modification agreements and unlawfully proceeded with foreclosures based on the mortgagor's failure to meet impossible shifting demands.  [*Id.* at ¶ 79].

Caires further alleges that "as a direct and proximate result of the Defendant's violations of CUTPA the Plaintiff has been injured and that he has suffered financial harm as well as psychological stress and damaged credit.  He further alleges that by paying fees and interest, he had to forgo other remedies that might have been pursued.  [*Id.* at ¶ 82].

ii.     **Second Cause of Action – "Unfair Debt collection practices in violation of CUTPA"**

In his second cause of action, Caires alleges that Chase has allegedly violated CUTPA by violating the Fair Debt Collection Practices Act ("FDCPA") and alleges that "violations of the FDCPA are violations of CUTPA."  [*Id.* at ¶ 88]. Caires alleges that Chase violated the FDCPA by:

> …using false, deceptive, and misleading statements and deceptive omissions in connection with its collection of the Plaintiff's mortgage debt…enticing Plaintiff to pay an extension fee and interest by promising a lower interest rate when the loan converted, refusing to convert his loan to the lower interest rate as promised in the loan documents; taking months to render a decision on his extension request; misrepresented the status of extension and draw request applications; repeatedly requesting duplicative financial information; failing to provide account information requested by Plaintiff; failing to provide adequate explanations of fees charged to Plaintiff; charging excessive and unreasonable fees; failed to properly apply mortgagor payments in whole or in part; rejected payments entirely without justification; caused improper interest and other fees to accrue. These statements no only deceived the Plaintiff but are also likely to deceive the least sophisticated debtor and/or any reasonable similarly situation person into believing the same. [*Id.* at ¶ 87].

iii.    **Third Cause of Action – "Breach of contract/breach of duty of good faith and fair dealing"**

Caires alleges as a third cause of action that Chase breached the duty of good faith and fair dealing implied in the loan agreement between Caires and Chase.  [*Id.* at ¶ 95].  Caires alleges that Chase "routinely presented" him with loan packages consisting of two parts "(1) verbal promises of a lower interest rate upon conversion, promises that Chase will timely review and process draw requests and extension applications, assurances of extensions automatically

upon the payment of a fee, loan amounts that are fixed, and (2) written materials that contain conflicting provisions, mention reserve accounts that are not scheduled, and loan amounts that change without reasonable basis."  [*Id.* at ¶ 92].

Caires alleges that Chase has allegedly breached this duty by:

(A) Failing to convert to the lower interest rate as disclosed in the Construction Term Rider pg 2, (B) collecting unreasonable and/or inadequately disclosed fees, interest or other charges; (C) misrepresenting the terms of and the balance of the loans being serviced; (D) improperly applying mortgage payments to accounts, failing to acknowledge receipt of payments, and/or holding mortgage payments in "suspense," resulting in escalated debt obligations, including additional fees, interest and other charges; thereto: (E) failing to retain, employ and supervise adequately trained staff; (F) misrepresenting the status of mortgagor accounts; (G) repeatedly requesting duplicative financial information or other documentation; (H) failing to keep accurate records of mortgagor accounts including accounting for fees, payments, credits, arrearages and amounts owed; (I) rejecting payments or refusing to withdraw payments without justification or explanation; and or (J) deliberately acting to delay, prolong or otherwise frustrate the loan process.  [*Id.* at ¶ 95].

> ### iv.    Fourth Cause of Action – "Breach of contract/breach of duty of good faith and fair dealing Third Party Beneficiary Theory"

Caires alleges as a fourth cause of action that Chase breached the duty of good faith and fair dealing with respect to the SPA entered into by Chase "for which the Plaintiff is the intended beneficiary and under which Chase has undertaken duties to act for the benefit of the Plaintiff."  [*Id.* at ¶ 99].  Caires alleges that Chase has breached the duty of good faith and fair dealing by:

(A) misrepresenting the requirements for extensions of the construction term and conversion to a lower interest rate on completion of the construction and the status of those application; (B) failing to offer the Plaintiff timely, affordable and permanent conversion to a lower interest rate on completion of the construction

(C) requesting and accepting payment for extensions without any intention of converting to a lower interest rate on completion of the construction or any reasonable basis to believe that the loan would be converting to a lower interest rate on completion of the construction and without taking diligent or reasonable steps to implement conversion to a lower interest rate on completion of the construction; (D) collecting unreasonable and/or inadequately disclosed fees, interest or other charges; (E) misrepresenting the terms of and the balances of  the loans being serviced; (F) improperly applying mortgage payments to accounts, failing to acknowledge receipt of payments, and/or holding mortgage payments in "suspense," resulting in escalated debt obligations, including additional fees, interest and other charges; (G) failing to retain, employ and supervise adequately trained staff; (H) misrepresenting the status of mortgagor accounts; (I) repeatedly requesting duplicative financial information or other documentation; (J) failing to keep accurate records of mortgagor accounts including accounting for fees, payments, credits, arrearages and amounts owed; (K) rejecting payments or refusing to withdraw payments without justification or explanation; and or (L) deliberately acting to delay, prolong or otherwise frustrate the loan process and failing to follow through on written and implied promises.  [*Id.* at ¶ 101].

     *v.*     *Fifth Cause of Action – "Unjust enrichment"*

     Caires alleges as a fifth cause of action that Chase was unjustly enriched because:

     The Plaintiff conferred upon Defendant without knowledge of the unlawful and deceptive pattern and practice in which the Defendant was engaged, mortgage payments, including fees, interest and other charges, benefits that were non-gratuitous.  These benefits were beyond that to which the Defendant is or was entitled.  The Defendant accepted or retained the non-gratuitous benefits conferred by the Plaintiff even though the Plaintiff was not receiving the quality of or fairness in mortgage loan servicing that had been represented by the Defendant or that reasonable mortgagors would have expected.  The Defendant induced the Plaintiff to continue making payments and to allow the bank to advance money to itself thus increasing Plaintiff's indebtedness while Defendant had no intention of converting the loan to a lower interest rate.  Accordingly, the Defendants made promises that were illusory.  Further, the Defendant prolonged the approval process to generate revenue for itself and increased profits to the Defendant.  [*Id.* at ¶ 106].

Caires maintains that allowing Chase to retain "the non-gratuitous benefits conferred upon the Defendant by the Plaintiff under these circumstances is unjust and inequitable."  [*Id.*].

Caires alleges that he has been injured by all the actions of Chase, as set out above.  He has suffered "financial harm as well as undo psychological stress and damaged credit while enduring the Defendant's unlawful practices…By paying fees and interest, the Plaintiff had to forgo other remedies that might have been pursued.  The Plaintiff has also given up valuable time and effort to meet the Defendant's demands."  [*Id.* at ¶¶ 82, 89, 97].

### Legal Standard

In deciding a motion to dismiss pursuant to Rule 12 (b)(6) the Court accepts as true all of the complaint's factual allegations and draws inferences from these allegations in the light most favorable to the plaintiff.  However, "[a] pleading that offers 'labels and conclusions' or 'formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  (internal quotations omitted).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (internal citations omitted).

In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint. *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 129 S.Ct. at 1949-50). "At the second step, a court should determine whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 129 S.Ct. at 1950). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S.Ct. at 1949 (internal quotation marks omitted).

<u>Analysis</u>

### i.   *First Cause of Action – CUTPA*

At the outset, the Court notes that Caires's second amended complaint is far from a model of clarity. In his first cause of action, Caires casts several different theories as to how Chase allegedly violated CUPTA. First, Caires alleges that Chase violated CUTPA by breaching "Chase's Agreement with Fannie Mae [also referred to as the SPA] of which the Plaintiff is the intended beneficiary." Next, Caires alleges that Chase violated CUPTA by "violating the Consent Order issued by the OCC and the Federal Reserve." [Dkt. # at ¶ 77]. Lastly, Caires alleges a long list of generalized grievances about Chase's conduct in servicing his construction loan. [*Id.* at ¶ 79].

"[T]o prevail on a CUTPA claim, the plaintiffs must prove that (1) the defendant engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce . . . and [plaintiff suffered] ascertainable loss of money or property as a result of the defendant's acts or practices." *Neighborhood Builders, Inc. v. Town of Madison*, 294 Conn. 651, 657 (2010) (quoting CONN. GEN. STAT. § 42-110b(a); CONN. GEN. STAT. § 42-110g(a)).

"It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other businessmen]. *Hoffnagle v. Henderson*, No.CV020813972S, 2003 WL 21150549, at *8 (Conn. Super. Ct. April 17, 2003) (internal quotation marks and citations omitted). "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three…Thus a violation of CUTPA may be established by showing either an actual deceptive practice or a practice amounting to a violation of public policy." *Id.* (internal quotation marks and citations omitted).

Caires's theory that Chase violated CUTPA by violating the terms of the consent order is utterly baseless because the consent order was not in existence at the time of the conduct alleged in the Complaint.  It was not executed until almost two years after the last instance of alleged misconduct by Chase against Caires.  Caires alleges that the consent order was executed on April 13, 2011 while the last date of misconduct alleged was Chase's August 12, 2009 notification that Caires's loan would not be converted to a lower interest rate.  Certainly, Chase cannot be held liable under CUTPA for breaching a contract which did not exist at the time of its alleged misconduct.  In addition, since the consent order did not exist at the time of the alleged misconduct, the consent order could not constitute an established public policy for purposes of establishing liability under CUTPA.  Consequently, Caires's theory that Chase violated CUTPA on the basis of the consent order is entirely untenable.  To the extent Caires's claim is that the consent order was issued to redress the practices about which he claims, he fails to plead facts sufficiently particularized to sustain such a claim.

### a. Caires has failed to plausibly allege there were aggravating circumstances attending the alleged breach of contracts to state a claim under CUTPA

Chase argues that Caires's theory that it violated CUTPA by breaching the SPA and the consent order is unavailing because a simple breach of contract is insufficient to establish a violation of CUTPA.  *See e.g., Boulevard Associates v. Sovereign Hotels, Inc.,* 72 F. 3d 1029, 1038-39 (2d Cir. 1995) (holding that a "simple contract breach is not sufficient to establish a violation of CUTPA,

19

particularly where the count alleging CUTPA simply incorporates by reference the breach of contract claim and does not set forth how or in what respect the defendant's activities are either immoral, unethical, unscrupulous or offensive to public policy"); *Aztec Energy Partners, Inc. v. Sensor Switch, Inc.*, 531 F. Supp. 2d 226, 232 (D. Conn. 2007) (noting that a "simple breach of contract does not offend traditional notions of fairness and does not violate CUTPA.") (internal quotation marks and citation omitted); *Emlee Equip. Leasing Corp. v. Waterbury Transmission, Inc.,* 41 Conn. Supp. 575, 580 (Conn. Super. Ct. 1991) ("'A simple breach of contract, even if intentional, does not amount to a violation of the Act; a [claimant] must show substantial aggravating circumstances attending the breach to recover under the Act....").

Caires argues that he has alleged sufficient substantial aggravating circumstances attending the breach to recover under CUTPA for a breach of contract such as "ineptitude, carelessness, and negligent conduct of business which caused the plaintiff substantial inconvenience and expense to unscrupulous and unethical misrepresentations upon which he reasonably relied and which cost ultimately him thousands of dollars."    [Dkt. #86, Pl. Mem. at p. 18].  Caires is correct that Connecticut courts have permitted a CUTPA cause of action based on a breach of contract where there are aggravating circumstances attending the breach such as where there has generally "been some type of fraudulent behavior accompanying the breach or aggravating circumstances." *Pace v. North Haven Academy, LLC*, No.CV096005922S, 2010 WL 2108491, at *3 (Conn. Super. Ct. April 23, 2010).  "Conduct that has been held to be substantial

aggravating circumstances sufficient to support CUTPA claims includes fraudulent representations, fraudulent concealment, false claims ... and multiple breaches of contract." *Leonard v. Tabacco Const., LLC*, No.CV095014717, 2012 WL 2149402, at *6 (Conn. Super. May 10, 2012) (internal quotation marks and citations omitted).

Here, Caries's argument is misplaced as the conduct he relies on occurred prior to the execution of either the SPA or the consent order and therefore cannot be considered aggravating circumstances attending the breach in view of that fact. Caires alleges that the SPA was executed on July 31, 2009 while the consent order was executed on April 13, 2011.  The only specific conduct post July 21, 2009 alleged in the second amended complaint was that Caries received notification from Chase on August 12, 2009 that the terms of the note did not require Chase to convert Caires's loan to a lower interest rate.  An allegation that Chase notified Caires that he was not entitled to a lower interest rate based on the terms of the note does not support a plausible inference that Chase engaged in fraudulent behavior accompanying the alleged breach of the SPA. Consequently, Caires has failed to plausibly allege aggravating circumstances attending the breach of both contracts sufficient to permit a CUTPA cause of action based on a breach of those contracts.

Even assuming that such conduct was attending the breach of the SPA or the consent order and not prior to the execution of either, Caires fails to specifically identify such allegedly "unscrupulous and unethical misrepresentations" in the second amended complaint to give fair notice under

21

Federal Rule of Civil Procedure 8 as to "what Plaintiff's claim is and the grounds upon which it rests."   *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (internal quotation marks and citations omitted); *see also Monson v. Whitby School, Inc.*, No.3:09CV1096(MRK), 2010 WL 3023873, at *3 (D. Conn. Aug. 2, 2010) ("The purpose of Rule 8 is to provide a defendant notice of what they are alleged to have done that the plaintiff claims was unlawful.").  Moreover, Chase's conduct while not a model of efficiency or best practices does not constitute deception, fraud, predatory or otherwise egregious conduct sufficient to constitute a CUTPA claim.  Accordingly, Caires has failed to plausibly allege aggravating circumstances which would permit recovery for a breach of contract under CUTPA.

### b. Caires has also failed to plausibly allege that he is a third party beneficiary of the SPA or the consent order

Chase also argues that since Caires was not a party to the SPA or the consent order, he cannot rely on a theory of breach of contract to support his CUTPA claim nor can Caires demonstrate he was a third party beneficiary of those contracts to do the same.  Here since the United States is a party to both the SPA and the consent order Federal law controls.  *See EEOC v. Fed. Express Corp.*, 268 F.Supp.2d 192, 204 (E.D.N.Y. 2003) ("[C]ontracts with the federal government are governed by federal common law.") (citing *Falls Riverway Realty, Inc. v. City of Niagara Falls,* 754 F.2d 49, 55 n. 4 (2d Cir.1985)).  "According to federal common law, a third party must be an intended, rather than incidental, beneficiary in order to enforce a contract. Federal common law, in deciding whether a third-party beneficiary may sue, looks to the same considerations as

does the Restatement of Contracts." *Rivera v. Bank of America Home Loans*, No. 09 CV 2450(LB), 2011 WL 1533474, at *7 (E.D.N.Y. April 21, 2011) (internal quotation marks and citations omitted).  Section 302 of the Restatement (Second) of Contracts provides that "[u]nless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and ... (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."  Restatement (Second) of Contracts § 302(1) (1981).

In the context of a government contract, the Restatement provides that "[g]overnment contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested." Restatement (Second) of Contracts § 313 cmt. a.  Section 313 of the Restatement (Second) of Contracts provides:

> a promisor who contracts with a government or governmental agency to do an act for or render a service to the public is not subject to contractual liability to a member of the public for consequential damages resulting from performance or failure to perform unless (a) the terms of the promise provide for such liability; or (b) the promisee is subject to liability to the member of the public for the damages and a direct action against the promisor is consistent with the terms of the contract and with the policy of the law authorizing the contract and prescribing remedies for its breach.

Restatement (Second) of Contracts § 313(2) (1981); *see also Klamath Water Users Protective Ass'n v. Patterson,* 204 F.3d 1206, 1211 (9th Cir.1999) ("Parties that benefit from a government contract are generally assumed to be incidental

beneficiaries, and may not enforce the contract absent a clear intent to the contrary.") (citing Restatement (Second) of Contracts § 313(2)).

Here, Caires suggests that he is a third party beneficiary because HAMP was enacted to protect borrowers like him.  However, other courts have rejected the contention that a member of the public can be considered a third party beneficiary of a government contract on the sole basis that contract was intended to benefit the public absent clear intent indicating the public's right to enforce the contract as a third party beneficiary.  *See e.g., Maggio v. Leeward Ventures, Ltd.*, 939 F. Supp. 1020, 1031 (E.D.N.Y. 1996) (holding that temporary receiver of mortgaged property was not intended beneficiary of consent order entered between the FDIC and a failed bank as the language of the contract did not clearly evidence an intent to permit enforcement by third party); *John Street Leasehold LLC v. The Federal Deposit Insurance Corp.*, No.95CIV.19174, 1996 WL 737196, at *10 (S.D.N.Y. Dec. 24, 1996) (no beneficiary status for plaintiff to agreement between FDIC and participating banks as the agreement did not expressly or implicitly require the syndicate banks to render any performance or undertake any responsibilities" to plaintiff and where "plaintiff's contractual rights were delineated by the Mortgage Agreement."); *Mantie v. Inn at Manchester, Inc.*, No.CV950058009S, 1997 WL 16845, at *10 (Conn. Super. Ct. Jan. 9, 1997) (striking allegation that defendant is liable to plaintiff as a third party beneficiary of Agreement between an Inn and the Town of Manchester pertaining to road improvements as "government contracts by definition benefit the public, but individual members of the public are treated as incidental beneficiaries 'unless a

different intention is manifested [and] a promise to do an act for or render a service to the public does not have the effect of a promise to pay consequential damages to individual members of the public' except under certain limited circumstances.") (quoting Restatement (Second) of Contracts § 313)).

In the second amended complaint, Caires does not allege that he was a third party beneficiary of the consent order and only conclusory alleges that he was the intended beneficiary of the SPA.  The second amended complaint is therefore devoid of any factual allegations which support a reasonable inference that Caires was intended to benefit from the government contract and that third-party beneficiary claims are consistent with the terms of the contract and the policy underlying it.  Since Plaintiff has failed to plausibly allege that he was a third party beneficiary of the SPA or the consent order, Plaintiff's CUTPA claim predicated on the alleged breaches of the SPA and consent order must fail on this basis as well.

In addition, another district court within this circuit has concluded that a borrower was not a third party beneficiary to an equivalent SPA with Fannie Mae for HAMP.  *Rivera*, 2011 WL 1533474, at *7.  As the *Rivera* court noted, the "precise issue of whether a borrower is the third party beneficiary to a Servicer Participation Agreement between Fannie Mae and a mortgage servicer is a matter of first impression for courts within the Second Circuit." *Id.* at *3.  The *Rivera* court concluded that "the terms of the Agreement as well as the policy underlying the HAMP reflect that the sole intended benefit of the Agreement was the provision of home loan modifications to qualified borrowers like plaintiff." *Id.* at

*4; *see also Marques v. Wells Fargo Home Mortgage, Inc.*, No.09-cv-1985, 2010 WL 3212131, at *6 (S.D. Cal. Aug. 12, 2010) ("Upon a fair reading of the Agreement in its entirety and in the context of its enabling legislation, it is difficult to discern any substantial purpose other than to provide loan modification services to eligible borrowers.")).  In coming to this conclusion, the *Rivera* court also noted that courts in this circuit have held that public housing tenants are third party beneficiaries under federal housing contracts.  *Id.* (collecting cases).  Like the *Rivera* court, this Court agrees that the SPA "expresses a clear intent to directly benefit the eligible borrowers." *Id.* at *5.

However, the *Rivera* court concluded that although there was the intent to benefit eligible borrowers, the terms of the SPA preclude the plaintiff from enforcing its provision since the SPA contained an express provision which stated that "Agreement shall inure to the benefit of and be binding upon the parties to the Agreement and their permitted successors-in-interest" and "detailed the actions which constitute a default by defendant and the remedies specifically available to Fannie Mae in the event of defendant's default."  *Id.* at *6. The *Rivera* court stressed that "almost all federal courts to have addressed this precise issue have rejected borrowers' claims to enforce the Servicer Participation Agreements as third party beneficiaries."  *Id.* at *6 (collecting cases). As was the case in *Rivera*, the SPA at issue also contains the same language that the "Agreement shall inure to the benefit of and be binding upon the parties to the Agreement and their permitted successors-in-interest" and details the actions that constitute default and the remedies available to Fannie Mae.  [Dkt. #67, Ex. I,

§§ 6 and 11E].   The Court concurs that such language indicates that a direct action by a third party beneficiary would be inconsistent with the terms of the SPA and accordingly an eligible borrower could not seek to enforce the terms of the SPA as a third party beneficiary in the absence of a specific provision creating a private right of action to enforce the agreement or redress its breach.

Even if this Court did not find that the terms of the SPA precluded an eligible borrower from enforcing its provisions, it is clear that SPA was not intended to benefit a borrower like Caires as he did not meet the eligibility criteria for HAMP.   As Chase points out, for a borrower with a one-unit residence, like Caires, to be eligible to participate in HAMP "the current unpaid principle balance (UPB) of the mortgage loan prior to capitalization must be no greater" than $729,750.   Home Affordable Modification Program, Supplemental Directive 09-01, Introduction of the Home Affordable Modification Program (April 6, 2009).   Here, Caires's $5.5 million loan far exceeds this amount and thus he would not be eligible for HAMP.   In view of this, Caires could not have been an intended beneficiary of the SPA as the terms of the SPA as well as the policy underlying HAMP demonstrate only an intent to benefit those borrowers who are eligible. Since Caires would not be HAMP eligible he could not be a third party beneficiary to the SPA even if the terms of the SPA had not precluded any borrower from enforcing its provisions.   Since Caires is not a third party beneficiary to either the SPA or the consent order, he cannot seek to enforce the terms of either contract. Consequently, Caires's theory that Chase is liable under CUTPA for breaching the consent order and the SPA is unavailing.   For all the aforementioned reasons, the

Court grants Chase's motion to dismiss the first cause of action to the extent that it is based on the alleged breach of the consent order or the SPA.

Caires erroneously argues that this Court cannot consider whether Caires is eligible for HAMP on a motion to dismiss because that would involve referring to material outside of the pleadings.  *See* [Dkt. #86, Pl. Mem. at p.34].  "However, where a plaintiff does not attach to the complaint or incorporate by reference a document on which it relies and which is integral to the complaint, a defendant may introduce that document as part of a motion attacking the pleadings."  *Colon v. Town of West Hartford*, No.3:00cv168(AHN), 2001 WL 45464, at *1 n.1 (D. Conn. Jan. 5, 2001) (citing *Cortect Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991)).  Integral to Caires's complaint is Caires's assertion that he is entitled to enforce the provisions of the SPA under HAMP and therefore documentation regarding HAMP is integral to the complaint and may be reviewed by this Court in its analysis on the pending motion to dismiss.  Further, it is "well established that a district court may rely on matters of public record in deciding a motion to dismiss, including case law and statutes." *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998).  Here, government publications regarding HAMP are undoubtedly a proper subject of judicial notice and can be reviewed on a motion to dismiss.  *See e.g., Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 556 (7th Cir. 2012 ) (taking judicial notice of background information on the HAMP program on a motion to dismiss); *Mcinnis v. BAC Home Loan Servicing, LP*, No.2:11cv468, 2012 WL 383590, at *7 (E.D.Va. Jan. 13, 2012) (taking "judicial notice of the fact that HAMP Guidelines 'guarantee only that an eligible borrower

will be evaluated for a loan modification,' and do not require mortgage servicers to modify loans.") (citation omitted); *Gaudin v. Saxon Mortg. Servs., Inc.*, No.C11-1663RS, 2011 WL 5825144, at *3 n.1 (N.D.Cal. Nov. 17, 2011) (holding that request for "judicial notice of various government publications related to the HAMP program" was proper).

### c. Caires has also failed to plausibly allege that Chase has otherwise violated CUTPA

Caires argues in opposition to the motion to dismiss that regardless of whether his theory that Chase breached the SPA or the consent order is availing, he has otherwise alleged that Chase has engaged in unfair or deceptive practices in the conduct of its trade or business which caused him ascertainable loss sufficient to state a claim for relief under CUTPA.  [Dkt. #86, Pl. Mem. at 12-14]. Caires points to paragraph 79 of his complaint in which he alleges a long list of generalized grievances about Chase's conduct in servicing his construction loan. [*Id.*].  Caires argues that he has alleged that he "was enticed to pay an extension fee and interest by promising him a lower rate when the loan was converted and then refusing to the lower rate this would suffice to state a claim under CUTPA" and that "[c]onsidered in concert with other allegations, such as the charging of improper fees and interest, wrongful rejection of payments, misrepresentation of the status of draw and extension requests, and other claims, and there can be no reasonable question that the plaintiff had a viable claim" under CUTPA.  [*Id.*].

The vast majority of the grievances alleged in support of Caires's CUPTA claim are generalized grievances which are devoid of further factual enhancement

essential to state a claim to relief that is plausible on its face.  For example, Caires conclusory alleges that he was charged "excessive and unreasonable fees," that Chase "rejected payments without justification," breached "modification agreements," "unlawfully proceeded with foreclosures based on the mortgagor's failure to meet impossible shifting demands," and "inexplicably and arbitrarily increased mortgagor debt obligations."  [Dkt. #80, SAC at ¶79]. Subjective conclusions unsupported by specific facts are insufficient to allow the Court to draw the reasonable inference that Chase violated CUTPA.

Caires also alleges that Chase violated CUTPA by "refusing to convert his loan to the lower interest rate promised in the loan documents."  Although not clearly alleged in the second amended complaint, it appears that it was Caires's understanding that under the terms of his loan he was entitled to a lower interest once construction was finished and a certificate of occupancy was obtained. However, the Court has reviewed the loan documentation that Caires attached to his second amended complaint and cannot find any reference to such an entitlement.

The construction loan agreement and the addenda thereto provide the interest at a fixed rate until 2012.  Caires was required to make only interest payments during the construction period.  [Dkt. # 67,SAC, Exhibit B, at 1].  After the completion of construction and the presentment by Caires of a certificate of occupancy, the construction loan was to rollover and be converted to a permanent loan at which point the Plaintiff was required to pay both principal and interest at 8.5%.  In 2012, the interest was subject to annual adjustment either

higher or lower no more than 2%, with a maximum rate of 11.95%.  While Caires asserts that Chase was required to lower the interest rate after the completion date, he cites no provision of any agreement to support this claim and the Court has not found any.  On the contrary, the documents reflect the parties' agreement to maintain the same interest rate until September 2012 and to adjust the rate upward or every 12 months thereafter either downward based on an index. Moreover, Caires was unable to perform the contract by completing the construction timely and converting the construction loan to a permanent loan as he was in actual or imminent breach of his agreement with Chase.  Chase had no duty to perform by reducing the interest rate.  *See McKenna v. Woods*, 21 Conn.App. 528, 534 (1990) ("It has also long been accepted that an anticipatory breach discharges any remaining duties of the nonbreaching party, and once there has been a repudiation that party is no longer required to hold himself ready, willing and able to perform.").

Lastly, Caires has failed to allege how this laundry list of acts offends public policy as established by statute or common law or other established concept of unfairness or is immoral, unethical, oppressive or unscrupulous.  *See Daniel R. Kaufman, CPA, LLC v. Vertucci*, No3:11cv912(WWE), 2011 WL 6001632, at *3 (D. Conn. Nov. 30, 2011) (holding that although "Plaintiff's CUTPA allegations mention Vertucci's use of an unregistered trade mark … the complaint is devoid of facts supporting any violation of public policy as required for CUTPA"); *Priority Sales Management, Inc. v. Carla's Pasta, Inc.*, No.3:10-cv-1918 (CFS), 2011 WL 3819748, at *3 (D. Conn. Aug. 26, 2011) (noting that "Courts have

held that merely stating that the defendant's conduct violates public policy or is unfair and/or deceptive is not sufficient to sustain a CUTPA claim.") (internal quotation marks and citation omitted).   As discussed above, since the consent order and the SPA did not exist at the time of this alleged misconduct they could not have been reflective of established public policy for purposes of establishing liability under CUTPA.  Consequently, Caires's allegations fail to state a plausible claim to relief under CUTPA and the Court grants Chase's motion to dismiss the first cause of action in its entirety.

### ii.   Second Cause of Action – "Unfair Debt collection practices in violation of  CUTPA"

Chase argues that Caires's second cause of action fails because the FDCPA does not apply to Chase since Chase is not a debt collector for purposes of the FDCPA.  [Dkt. #80, Def. Mem. at p. 15-16].  Caires's second cause of action is expressly predicated on his assertion that Chase should be considered a debt collector under the FDCPA and that Chase's  alleged violation of the FDCPA is tantamount to a violation of CUTPA.   It is well established that the FDCPA applies only to persons who collect the debts of others and does not apply to those who collect their own debts.  *See e.g., Beck v. Alliance Funding Co.*, 113 F. Supp. 2d 274, 276 (D. Conn. 2000) ("The Act is quite clear that it is directed at independent debt collectors and not creditors attempting to collect on their own debts"); *Kloth v. Citibank (South Dakota), N.A.*, 33 F. Supp. 2d 115, 119 (D. Conn. 1998) ("Generally, the FDCPA does not apply to creditors"); *Book v. Mortgage Electronic Registration Systems*, 608 F. Supp. 2d 277, 284 (D. Conn. 2009) ("as a mortgage company, [the defendant] was collecting a debt on its own behalf and

thus cannot be fairly characterized as a 'debt-collector' subject to the FDCPA").
The allegations of the second amended complaint undeniably demonstrate that
Chase was Caires's creditor and was attempting to enforce the terms of its own
loan agreement.  Consequently Chase, as a creditor collecting its own debt, is not
subject to the FDCPA.

Caires argues that since Chase held itself out as a debt collector in its
correspondence with Caires that it should be estopped from taking a contrary
position.  [Dkt. #86, Pl. Mem. at p. 21-25].  However this argument is unpersuasive
as the issue of whether the FDCPA would apply to a particular defendant is a
legal question and "merely announcing that one is a FDCPA debt collector does
not make you one."  *Fouche' v. Shapiro & Massey L.L.P.*, 575 F.Supp.2d 776, 788
N.6 (S.D. Miss. 2008).  *See e.g., Stamper v. Wilson & Assocs., P.L.L.C.*, No.3:09-cv-
270, 2010 WL 1408585, at *9 (E.D. Tenn. Ma. 31, 2010) ("The question of whether
defendants qualify as 'debt collectors' is a legal question which requires the
court to examine the nature of the defendant's business.  The fact that FDCPA
disclaimers were sent in connection with a non-judicial foreclosure proceeding
does not automatically transform the defendants into 'debt collectors' …
Furthermore, it is perfectly reasonable for Wilson & Associates to err on the side
of caution by including FDCPA disclaimers."); *Chomilo v. Shapiro, Nordmeyer &
Zielke, LLP*, No.06-3103(RKK/AJB), 2007 WL 2695795, at *6 (D. Minn. Sept. 12,
2007) (rejecting argument that by including FDCPA disclaimers a defendant is
estopped from asserting it is not a debt collector as Plaintiff failed to show she
relied on the FDCPA disclaimers to her detriment and holding that "it was

reasonable for [defendant] to err on the side of caution and include the FDCPA disclaimers in its communications to [plaintiff]."); *Alexander v. Omega Mgmt., Inc.*, 67 F.Supp. 2d 1052, 1056 (D. Minn. 1999) (holding that inclusion of FDCPA language in correspondence did not estop a defendant from denying that it is a debt collector).

Even if equitable estoppel was relevant, Caires has failed to allege that he relied on the FDCPA disclaimer to his detriment in order to be entitled to invoke equitable estoppel.  *See Johnson v. Walden University, Inc.*, No.3:08cv00045(DJS), 2011 WL 6140925, at *15 (D. Conn. Dec. 9, 2011) ("'Under our well-established law, any claim of estoppel is predicated on proof of two essential elements: the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and the other party must change its position in reliance on those facts, thereby incurring some injury.'") (quoting *Connecticut National Bank v. Voog,* 233 Conn. 352, 366, 659 A.2d 172 (1995)).  Consequently, Plaintiff's theory that Chase violated CUTPA by violating the FDCPA is unavailing and the Court therefore dismisses Caires's second cause of action.

### iii.    Third Cause of Action – "Breach of contract/breach of duty of good faith and fair dealing"

Chase argues that Caires's third cause of action for breach of the implied covenant of good faith and fair dealing fails because Caires has not alleged the existence of a written instrument which Defendant has alleged was breached. Chase also argues that such a cause of action cannot be applied in this instance

because it would achieve a result contrary to the clearly expressed terms of a contract.   Caires argues that there is no caselaw holding that such a cause of action cannot be maintained with respect to an oral contract.   Caires also argues that his allegations in paragraph 95 of the second amended complaint plausibly state a claim for breach of the implied covenant of good faith and fair dealing. Here the Court assumes without deciding whether a claim for breach of the implied covenant of good faith and fair dealing can apply to an oral contract.

"[I]t is axiomatic that the ... duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship ... In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement ... The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term." *Rafalko v. University of New Haven,* 129 Conn.App. 44, 51 (2011) (internal quotation marks omitted).   Accordingly, "the implied covenant of good faith and fair dealing obviously rests upon the express terms of the contract and the parties' reasonable expectations thereunder." *Weissman v. Koskoff*, No.HHDCV106012922S, 2011 WL 590461, at *3 (Conn. Super. Ct. Jan. 19, 2011) (citing *Magnan v. Anaconda Indus., Inc.*, 193 Conn. 558, 572 (1984); *Beckenstein Enterprises-Prestige Park, LLC v. Keller*, 115 Conn. App. 680, 693-94 (2009)).  "As a logical corollary of that rule, our appellate courts have declared that, '[a] claim for breach of the implied covenant of good faith and fair dealing must be based

on the terms of the contract and cannot be applied to achieve a result contrary to the express terms.'"  *Id.* (quoting *Beckenstein*, 115 Conn. App. at 693-94). Against this backdrop, "[t]o constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." *Landry v. Spitz,* 102 Conn.App. 34, 42 (2007) (internal quotation marks).

First, the vast majority of the allegations in support of Caires's breach of the covenant of good faith and fair dealing claim are generalized grievances which are devoid of further factual enhancement to state a claim to relief that is plausible on its face.   For example, Caires conclusory alleges Chase (i) "improperly appl[ied] mortgage payments to account," (ii) held "payments in suspense," (iii) failed to "retain, employ and supervise adequately trained staff," rejected payments without justification," (iv) "collecting unreasonable and/or inadequately disclosed fees, interest or other charges," and (v) "deliberately act[ed] to delay, prolong or otherwise frustrate the loan process."  [Dkt. #67, SAC at ¶95].  There is insufficient factual content in support of this laundry list of grievances to allow the Court to draw the reasonable inference that Chase breached the implied covenant of good faith and fair dealing in connection with his loan agreement on the basis of these generalized allegations.  Second, Caires fails to allege how all of these acts impeded his right to receive benefits that he reasonably expected to receive under the contract to state a claim for relief that is plausible on its face.  Caires fails to identify which benefit he reasonably

expected to receive under the contract that he was deprived of on the basis of these alleged acts by Chase.

Caires also alleges that Chase breached the covenant of good faith and fair dealing by "[f]ailing to convert to the lower interest rate as disclosed in the Construction Term Rider."  [*Id.*].  As discussed above, there is no reference anywhere in the loan documents to this entitlement and therefore Caires's allegation in this regard is unfounded.   Considering that the loan documents do not provide for the interest rate to convert as Caires alleges, Caires has failed to plausibly allege that he had a reasonable expectation that his interest rate would convert in order to state a claim for breach of the implied covenant of good faith and fair dealing in the first instance.   Furthermore, since the loan documents do not contain such a provision there cannot be a dispute about the discretionary application or interpretation of such a contract term where no such term exists. As Defendants suggest for the Court to hold there was a breach because Chase failed to convert Caires's loan to the lower interest rate that would be contrary to the express terms of the contract.

In addition, "[a]bsent allegations and evidence of a dishonest purpose or sinister motive, a claim for breach of the implied covenant of good faith and fair dealing is legally insufficient." *Alexandru v. Strong,* 81 Conn .App. 68, 81 (2004). "In order to prevail on a claim of bad faith, it is necessary for the complaint to allege a specific act that was performed purposefully, with a sinister intent ... Even if it was found that there was a breach of contract, not all contracts are breached with a sinister intent."  *Longo v. Longo*, No.FSTCV106003946S, 2012 WL

2334128, at *3 (Conn Super Ct. May 15, 2012) (internal quotation marks and citation omitted).  "Bad faith has been defined in our jurisprudence in various ways.  Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive ... Bad faith means more than mere negligence; it involves a dishonest purpose ... [B]ad faith may be overt or may consist of inaction, and it may include evasion of the spirit of the bargain ..." *Brennan Assoc. v. OBGYN–Specialty Group, P.C.,* 127 Conn.App. 746, 759–60 (2011) (Internal quotation marks omitted).

"[T]here is a split of authority among Superior Courts as to what factual allegations are sufficient to constitute the element of bad faith ... The first line of cases requires specific allegations establishing a dishonest purpose or malice. In alleging a breach of the covenant of good faith and fair dealing, courts have stressed that such a claim must be alleged in terms of wanton and malicious injury [and] evil motive ... The second line of cases generally holds parties to a less stringent standard requiring that a plaintiff need only allege sufficient facts or allegations from which a reasonable inference of sinister motive can be made ... Even where courts have used an inference analysis, however, they have looked to allegations that the conduct at issue was engaged in purposefully."  *Longo v. Longo*, 2012 WL 2334128, at *3 (internal quotation marks and citation omitted). Here, Caires has failed to allege either specific allegations establishing a dishonest purport or malice or sufficient facts from which a reasonable inference

of sinister motive can be made.  There are no allegations that contain specific facts to state a plausible claim that Chase acted in bad faith.  The Court therefore grants Chase's motion to dismiss Caires's third cause of action.

  iv.  *Fourth Cause of Action – "Breach of contract/breach of duty of good faith and fair dealing Third Party Beneficiary Theory"*

  Chase argues that Caires's fourth cause of action should be dismissed because Caires is not a third party beneficiary to the SPA.  Caires's entire fourth cause of action is expressly predicated on Chase's purported breach of the duty of good faith and fair dealing under the SPA on a theory that he is a third party beneficiary of the SPA.   However as discussed *supra*, section (i) (b), the Court concluded that Caires could not have been the intended beneficiary of the SPA because he was not eligible for HAMP and even if Caires was eligible the terms of the SPA indicate that a direct action by a third party beneficiary would be inconsistent with the terms of the SPA and therefore no borrower could seek to enforce the terms of the SPA as a third party beneficiary.   Consequently, Caires's fourth cause of action which is entirely predicated on his alleged status as a third party beneficiary to the SPA is unavailing and the Court grants Chase's motion to dismiss Caires's fourth cause of action.

  v.  *Fifth Cause of Action – "Unjust enrichment"*

  Chase argues that Caires's fifth cause of action for unjust enrichment fails because Caires has failed to demonstrate that Chase received a benefit to which it was not entitled to Caires's detriment.  Chase argues that all payments received from Caires were made pursuant to the underlying mortgage agreement and

therefore Chase was not enriched beyond what it was entitled to receive under the contract.   Caires argues that the second amended complaint is "replete with allegations demonstrating that the Defendant realized unjust benefits in the form of, *inter alia*, inappropriate fees and interest charges, by virtue of its misrepresentations and ineptitude, as well as its penchant for delaying resolution of requests and thereby generating revenue for itself."   [Dkt. #86, Pl Mem. at p. 36-37].   Caires argues there was unjust enrichment because "he was enticed to pay an extension fee and interest by promising a lower interest rate when the loan converted, refusing to convert  his loan to the lower interest rate promised in the loan documents."   Caires argues that his allegations in paragraph 86 and 106 of the second amended complaint plausibly state a claim for breach of the implied covenant of good faith and fair dealing.

"Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment."   *Town of New Hartford v. Conn. Res. Recovery Auth.*, 291 Conn. 433, 451-52 (2009) (internal quotation marks and citations omitted).   "This doctrine is based upon the principle that one should not be permitted unjustly to enrich himself at the expense of another but should be required to make restitution of or for property received, retained or appropriated.... The question is: Did [the party liable], to the detriment of someone else, obtain something of value to which [the party liable] was not entitled?" *Id.* (internal quotation marks and citations omitted).

Here Caires's allegations in support of his unjust enrichment claim are again a laundry list of generalized grievances which are devoid of further factual enhancement to state a claim to relief that is plausible on its face.  For example, Caires conclusory alleges that he conferred upon Chase "mortgage payments, including fees, interest and other charges, benefits that were non-gratuitous" to which "beyond that which the Defendant…was entitled."  [Dkt. #67, SAC at ¶106].  Caires further alleges that he was induced to continue "making payments and to allow the bank to advance money to itself thus increasing Plaintiff's indebtedness while Defendant had no intention of converting the loan to a lower interest rate."  There is insufficient factual content in support of this laundry list of grievances to allow the Court to draw the reasonable inference that Chase was unjustly enriched on the basis of these generalized allegations.  As Chase contends, Caires's fails to specifically identify which fees he paid to Chase which Chase was not entitled to under the terms and provisions of his loan.   Again as discussed above, to the extent that Caires's unjust enrichment claim is predicated on his allegation that he was entitled to convert his loan to a lower interest rate, such an allegation is unfounded in view of the fact that loan documents do not contain any such provision.

Although not clearly alleged, it also appears that Caires is basing his unjust enrichment claim on his allegation that he was automatically entitled to obtain an extension of the construction loan upon paying a fee of a ¼ point of the loan amount and that Chase was unjustly enriched when they did not allow him to extend the construction phase upon the payment of the fee but also required that

41

he pay $26,816.87 and a loan reduction of $140,000.   [*Id.* at ¶¶47, 62].   However, the Construction Loan Addendum expressly states that "at Borrower's request, Lender *in its sole discretion may, but shall not be required to*, approve an extension" of the construction phase of the loan.  [Dkt. # 67, 2d Amend. Compl., Exhibit C, at 2] (emphasis added).   The Addendum also provides that "[a]ny such extension shall be subject to the following condition: (i) "Borrower must execute a Modification Agreement"; (ii) Borrower must pay to Lender an extension fee equal to ¼% of the face loan amount on the Note for each 30-day period, or portion thereof, for which the extension has been approve, as well as any other costs and expenses associated with the extension."  [*Id.*].  Accordingly, Caires did not have the right under the loan documents to an automatic extension upon payment of the fee.  Instead the loan documents unambiguously provide that Chase had the total discretion over whether to approve a request for an extension.   Consequently, Caires's allegation that Chase was unjustly enriched by the payment of the ¼ fee is unfounded considering the loan documents provide that Chase had sole discretion over extension requests.  In sum, the second amended complaint does not contain sufficient factual matter to state a claim for unjust enrichment that is plausible on its face.  The Court therefore grants Chase's motion to dismiss Caires's fifth cause of action.

<u>Conclusion</u>

Based upon the above reasoning, Defendant's [Dkt. #79] motion to dismiss is GRANTED as to all of Plaintiff's claims.  The Clerk is directed to close the case.

**IT IS SO ORDERED.**


**_____/s/_____**
**Hon. Vanessa L. Bryant**
**United States District Judge**


**Dated at Hartford, Connecticut: July 23, 2012**